

**Entered on Docket**
**April 12, 2010**

*Bruce A. Markell*
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                      )        Case No.: BK-S-09-17963-BAM
                                            )
                                            )        Chapter 13
ALFONSO PAGADUAN and                        )
EDITHA PAGADUAN,                            )
                                            )        Date:   September 9, 2009
                                            )        Time:  1:30 p.m.
        Debtors.                            )        Courtroom:    3
                                            )
_____             )

**OPINION AND ORDER REGARDING SANCTIONS**

  Randolph Goldberg ("**_Goldberg_**") runs a high-volume consumer bankruptcy practice in Las Vegas, Nevada. Over the past 13 years, he claims to have handled twenty to twenty five-thousand individual bankruptcy cases. At the time of the hearing on this matter, he was filing close to 200 cases a month. One of those cases filed was the bankruptcy of Editha and Alfonso Pagaduan (the "**_Debtors_**").

  Mr. Pagaduan is retired, and Ms. Pagaduan is a semi-retired nurse. Before filing this case, the Debtors had some familiarity with the bankruptcy process, as they had filed a chapter 7 bankruptcy case in 1987. They decided to file for bankruptcy again because their numerous investment properties had negative cash flow, and they were therefore unable to make the payments on these properties and on their primary residence. They thought that bankruptcy offered them the best chance of keeping their home and as much of their remaining property as they could.

The Debtors decided to hire Goldberg because they "saw him on TV."  The initial consultation with Goldberg was on March 4, 2009; the Debtors returned to engage him on May 6, 2009.  During the May appointment, they signed various documents.  These documents included a retainer agreement, which obligated them to pay Goldberg more than $5,000 over time, and which also required an immediate $1,000 payment.  The Debtors also signed authorizations allowing Goldberg to obtain their credit report and tax returns.[1]  Finally, they also gave Goldberg confidential personal information, such as their social security numbers, mothers' maiden names, dates of birth, places of birth, and pay stubs.

Goldberg filed a chapter 13 bankruptcy for the Debtors on May 15, 2009.  Three days later, Goldberg filed certificates of completion of pre-petition credit counseling for the Debtors.  These were dated May 15, 2009.[2]  Due to the problems outlined in this opinion, the Debtors soon requested that their case be dismissed.  That dismissal occurred on June 4, 2009.[3]  These problems also led to an evidentiary hearing regarding Goldberg's practices on this and other cases.

To put it bluntly, the Debtors contend that Goldberg forged their signatures on their filed credit counseling certificates.  They support this serious claim with undisputed proof that they were in Canada when the certificates were issued.  They also allege that Goldberg violated a previous

---

[1]More specifically, the Debtors signed "IRS Form 4506-T," which is entitled "Request for Transcript of Tax Return."

[2]Such certificates are critical to a debtor's case.  Under amendments to the Bankruptcy Code made in 2005, obtaining prepetition credit counseling is a condition to filing bankruptcy.  11 U.S.C. § 109(h).  While this is not a jurisdictional requirement, and consequently under certain circumstances may be waived, *see Rodriguez Mendez v. Salven (In re Rodriguez Mendez)*, 367 B.R. 109, 118 (B.A.P. 9th Cir. 2007), the court does not have the unfettered authority to excuse the Debtor's compliance with the credit counseling requirement, and would have dismissed the case upon its own motion if the Debtors did not obtain credit counseling or satisfy one of the statutory exceptions.  *See In re Moon*, 2007 WL 1087452, 2007 Bankr. LEXIS 1276 (Bankr. D. Id. 2007) (a bankruptcy court cannot excuse debtors from compliance with the congressionally mandated credit counseling requirement).

[3]The Debtors requested dismissal under 11 U.S.C. § 1307(b).  The dismissal order specifically reserved jurisdiction to hear this sanctions matter.

2

order of this court, entered in *In re Sanford*, No. 04-21213-bam, while representing them.  Finally, they point to other misconduct.

Goldberg's response was that although no one in his office had any memory of the meetings with the Debtors before they filed the Debtors' case, his office's internal procedures make forgery impossible.  He denied any other misconduct.

On July 22, 2009, this court issued an Order to Show Cause regarding the allegations and held a hearing on the order.  One co-debtor, Editha Pagaduan ("***Pagaduan***") testified, as did Goldberg and Adam Parmelee ("***Parmelee***").  Parmelee is a "paralegal 'slash' office administrator" in Goldberg's office.  Ms. Pagaduan testified based on her direct recollections of the events leading to the Order to Show Cause.

Since neither Goldberg nor Parmelee could remember any pre-petition dealings with the Debtors, their testimony focused exclusively on the standard practices of Goldberg's office.

**I. Fabricated Credit Counseling**

The Debtors first expressed their dissatisfaction with Goldberg in a letter to the court dated June 2, 2009 (Dkt. #19).  In this letter, the Debtors declared that they never took the pre-petition credit counseling required by 11 U.S.C. § 109.  They stated that they had been in Canada on that date and had airline tickets and passport entries to prove it.   At the hearing, no one contested that they were not in the United States on May 15, 2009, the date appearing on the credit counseling certificates.

In response, Parmelee testified as follows regarding the intake and credit counseling process in Goldberg's office:

> Basically, you would have them come into the office . . . whether it's myself or one of the girls, and we, we'll go to the computer. We'll ask them a bunch of questions, you know, such as their name, you know, city of birth, date of birth, and just go through the entire process with them, you know, why they're filing bankruptcy, if they're behind on their house, you know, the - if they have a house, if they have a car, bank accounts.

3

1  To complete the process, Goldberg orders a credit report, and from it collects information about the

2  prospective debtor's creditors.  The debtor's income information is collected from pay stubs or from

3  questioning the debtor.  Typically, all this information is then entered by one of Goldberg's staff into

4  an on-line credit counseling website, the clients read the information on credit counseling provided,

5  and then the credit counseling agency issues the certificate of completion.  The resulting certificate is

6  dated the day that the last of these acts is completed.

7       Goldberg's testimony was consistent with Parmelee's.  He testified that prospective debtors

8  "sit with a staff member who is on the computer, and the staff member enters the information into the

9  computer with the assistance of the client by asking them the questions, and then the certificate gets

10  issued, and then we can file the bankruptcy case."

11      As mentioned before, no one in Goldberg's office remembers the Debtors, so Goldberg could

12  not present evidence as to how or if the Debtors actually completed the credit counseling.  He does

13  not dispute the Debtors' testimony that, before their filing bankruptcy, they visited Goldberg's office

14  only twice: once on March 4, and again on May 6.  To explain how the Debtors' certificates of

15  completion were dated on a day when they were out of the country, Parmelee offered that as a general

16  matter if "there's anything missed" by the debtors during a credit counseling class or if "a box was

17  missed, not checked off, that should have been checked off, then we'll [one of Goldberg's staff] go

18  back and fix it, and we will resubmit it to the credit counselor."[4]  The resulting certificate is dated the

19  day the final box is checked.

20      Therefore, Goldberg would like the court to believe that the Debtors completed most of the

21  credit counseling class at Goldberg's office on May 6, 2009, missing only a box or two.  When

22  preparing to file the case on May 15, 2009, someone at Goldberg's office noticed the missed boxes,

23  and helpfully checked them, thereby generating a certificate stamped a day the Debtors were out of

24

25

26      [4]Goldberg offered FED. R. BANKR. P. 9010 as the source of this box-checking authority.  As explained below, the court disagrees with this interpretation of Rule 9010.

1  the country.

2       This is not a plausible account.  It ignores the uncontradicted and emphatic testimony of Ms.

3  Pagaduan that on May 6, 2009, neither she nor her husband were ever led to a computer, that they

4  were never in a room with a computer, that they never filled in forms on a computer, and that no one

5  entered data into a computer with them present.  The court finds this testimony truthful and credible,[5]

6  and therefore finds that at no point in Goldberg's office on May 6, 2009 did the Debtors take a credit

7  counseling class or participate in the process of taking one.

8       In an attempt to exculpate themselves, Goldberg and Parmelee both repeatedly testified about

9  how they could not complete the Debtors' credit counseling on their own without the Debtors being

10  present and participating because it would require too much personal information about the Debtors.[6]

11  Goldberg argues that since he or his staff could not complete the credit counseling class without

12  significant personal information from the Debtors, it then follows that the Debtors must have

13  participated in the credit counseling class themselves (perhaps with the actual data-entry being done

14  by someone in his office) and that at most, someone in his office checked a missed box or two.

15       That significant personal information would be required is absolutely true.  But it is also

16  irrelevant.  Based on the testimony, and the exhibits that Goldberg himself submitted, the court finds

17  that by May 6 Goldberg *did* have all the necessary information to complete the credit counseling

18  class on his own.  The Debtors authorized Goldberg to pull their credit report, which he testified that

19

20  _____

21       [5]During the hearing on the Order to Show Cause, the court saw how technologically challenged
     Ms. Pagaduan was when she twice struggled to turn off her ringing cell phone, and finally needed her

22  daughter's assistance to succeed.  This lends weight to her account - doubtless, if there had been a
     computer involved during her visit to Goldberg's office, she would have remembered it.

23       [6]"Because the information on there is so -- is such that you would need their information to do

24  it"; "Q. And how do you get this information? A. From the clients. Q. And, again, you couldn't fill this
     out without the client providing - A. No. There's no way - Q. - the information"; "Q. And you couldn't

25  take the test unless you had certain personal information. A. It would be impossible  without Mother's
     maiden name, date of birth, the city of -- the city of birth, all the relevant financial information,

26  Socials, date of birth, everything."

1  he did.  They gave Goldberg their social security numbers, dates and places of birth, pay stubs,

2  mothers' maiden names, and the ability to obtain transcripts of their tax return.  This is exactly the

3  information that someone would need to complete the credit counseling class without the Debtors'

4  participation.

5       Moreover, Goldberg's hypothetical account is contradicted by Ms. Pagaduan's truthful

6  testimony about the events of May 6, 2009.  Therefore, the court finds that the Debtors did not take,

7  complete, or participate at all in the production of the certificate of pre-petition counseling that

8  Goldberg filed with the court.  The court thus finds that Goldberg, or someone in his office,

9  impersonated the Debtors online to complete the class.  This is forgery.[7]

10      Goldberg argues in the alternative that FED. R. BANKR. P. 9010 authorized him to fill out the

11  credit counseling on his own, without the Debtors' participation.  That Rule states:

12      (a) *Authority to Act Personally or by Attorney*: A debtor, creditor, equity security
    holder, indenture trustee, committee or other party may (1) appear in a case under the
13      Code and act either in the entity's own behalf or by an attorney authorized to practice
    in the court, and (2) perform any act not constituting the practice of law, by an
14      authorized agent, attorney in fact, or proxy.

15  Presumably, Goldberg interprets the phrase, "preform any act . . . by . . . attorney in fact" to mean

16  that as the Debtors' attorney, he had the authority to complete the credit counseling class on their

17  behalf, without their participation.

18      Goldberg's interpretation of Rule 9010 is incorrect.  All Rule 9010 does is distinguish

19  between an attorney-at-law, permitted to practice law, and an attorney-in-fact – essentially an agent

20  – who is not permitted to practice law.[8]  It then attempts to ensure that a nonlawyer agent does not

21

22      [7]*Black's Law Dictionary* offers the following definition: "**forgery**, n. 1. The act of fraudulently
    making a false document or altering a real one to be used as if genuine . . . 2. A false or altered
23  document made to look genuine by someone with the intent to deceive . . . — Also termed fake . . .".
    BLACK'S LAW DICTIONARY (9th ed. 2009).

24      [8]*See* BLACK'S LAW DICTIONARY (9th ed. 2009), which provides the following distinction
25  between attorney at law and attorney in fact: "Attorney. 1. Strictly, one who is designated to transact
    business for another; a legal agent. — Also termed attorney-in-fact; private attorney. 2. A person who
26  practices law; LAWYER. — Also termed (in sense 2) attorney-at-law; public attorney." *See also*

1   engage in the unauthorized practice of law.  Put differently, Rule 9010 permits a debtor to "appear in

2   a case under the Code through an authorized agent or attorney-in-fact, who may perform any act not

3   constituting the practice of law."  10 COLLIER ON BANKRUPTCY ¶ 9010.02 (Alan N. Resnick &

4   Henry J. Sommer eds., 15th rev. ed. 2009).

5       But Rule 9010 is irrelevant to Goldberg's conduct, because he was acting as an attorney-at-

6   law, not an attorney-in-fact.  Rule 9010 does not grant untrammeled powers of agency to an

7   attorney-at-law, and it most certainly does not allow Goldberg to take credit counseling classes for

8   his clients.  To hold otherwise would be to implicitly allow Goldberg to go to law school for each of

9   his clients, and allow them to practice law with the degree he obtained in their name.

10      As Rule 9010 does not authorize this use of the Debtors' personal information, the question

11  turns to the consequences that flow from Goldberg's unauthorized use of that information.  There are

12  several.  First, Goldberg may have committed a crime.  To that end, the court will refer this matter to

13  United States Attorney for the District of Nevada pursuant to 18 U.S.C. § 3057.  Next, he may have

14  violated FED. R. BANKR. P. 9011.  Finally, he may have violated applicable Rules of Professional

15  Conduct.

16      By filing the certificates resulting from impersonating the Debtors and attempting to pass

17  them off as evidence that the Debtors took the credit counseling class, Goldberg violated FED. R.

18  BANKR. P. 9011(b).  That rule states that "by presenting to the court . . . a paper . . .  an attorney is

19  certifying that to the best of [his] knowledge, information or belief, formed after a reasonable inquiry

20  . . . (3) the allegations or factual contentions have evidentiary support."  Here, Goldberg forged the

21  certificates, and then presented them to the court as part of the Debtors' initial filing documents.

22      Since Goldberg or someone in his office generated the certificates by impersonating the

23  Debtors, Goldberg could not truthfully have made this certification.  Moreover, by creating falsified

24  documents and then filing them under penalty of perjury, the court finds that Goldberg's violation of

25
26  BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE (3d ed. 2009) (expanded explanation of
    the attorney/lawyer distinction and instructions for the proper usage of each term).

1   Rule 9011was in bad faith.  *See Professional Seminar Consultants v. Sino Am. Technology Exch.*

2   *Council*, 727 F.2d 1470, 1474 (9th Cir. 1984) (filing false documents constitutes bad faith, and since

3   the documents were filed to defeat a discovery order, that bad faith was sufficient to dismiss a case

4   on the merits under FED. R. CIV. P. 37(b)); *see also Martin v. Cox*, 213 B.R. 571, 572 (E.D. Ark.

5   1996) (affirming bankruptcy judge's finding that debtor's filing of falsified documents constituted

6   "the most extreme case she had ever seen of bad faith and manipulation" (citations omitted)), *aff'd,*

7   116 F.3d 480 (8th Cir. 1997).

8           Goldberg's conduct in creating the credit counseling certificates also violated Nevada Rules

9   of Professional Conduct 3.3 and 8.4.[9]  Rule 3.3 states that "(a) A lawyer shall not knowingly: (1)

10  Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact

11  or law previously made to the tribunal by the lawyer; [or] . . . (3) Offer evidence that the lawyer

12  knows to be false."  In other jurisdictions applying a version of Rule 3.3,[10] lawyers have been

13  sanctioned for violating the Rule by referring to affidavits filed in another case, despite knowing that

14  four of the affidavits had been repudiated and withdrawn.  *Lippman v. Dickinson*, 174 F.3d 1363

15  (Fed. Cir. 1999).  Other lawyers have been disbarred for similar conduct when they participated in

16  the presentation of false evidence at trial and when they encouraged clients to testify falsely.  *In re*

---

18  [9]Pursuant to the local rules in this district, the Nevada Rules of Professional Conduct apply to
19  attorneys admitted to practice before this court.  Local Rule IA 10-7.  The court may sanction any
    attorney that violates the local rules.  Local Rule IA 4-1 ("The court may, after notice and opportunity
20  to be heard, impose any and all sanctions on an attorney . . . who, without just cause: . . . (c) Fails to
    comply with these rules."); LR 10-7 ("Any attorney who violates [the Rules of Professional Conduct]
21  may be disbarred, suspended from practice before this court for a definite time, reprimanded or
    subjected to such other discipline as the court deems proper."); Local Rule 1001(e) ("Failure of
22  counsel . . . to comply with these rules . . . may be grounds for imposing sanctions, including, without
    limitation, monetary sanctions.").

23          Imposition of sanctions pursuant to the Local Rules is proper under prevailing law.  *Price v.*
    *Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1062 (9th Cir. 2009) ("In the federal system there is no
24  uniform procedure for disciplinary proceedings. . . . The individual judicial districts are free to define
    the rules to be followed and the grounds for punishment.")

25          [10]Nevada's Rules of Professional Conduct are based on the American Bar Association's Model
26  Rules, as are the Rules in many other states.

*Storment*, 837 S.W.2d 227 (Mo. 1994); *Matter of Edson*, 530 A.2d 1246 (N.J. 1987); *Board of Overseers of the Bar v. Dineen*, 481 A.2d 499 (Me. 1984).

Rule 8.4 provides that "It is professional misconduct for a lawyer to . . . (c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) Engage in conduct that is prejudicial to the administration of justice."  In other jurisdictions applying a version of this rule, lawyers have been sanctioned for simultaneous violations of  Rules 8.3(c) and (d) (and Rule 3.3 for good measure) for submitting to an appeals court a trial transcript deliberately edited to change its meaning on the point on appeal.  *In re Richards*, 943 P.2d 1032 (N.M. 1997).

To summarize, Goldberg, acting in bad faith, filed documents that he or someone in his office generated, and that he knew, or should have known, that the Debtors did not sign or otherwise adopt.  Yet he certified them as completed by the Debtors nonetheless.  Goldberg has thus also violated Rules 3.3 and 8.4.

**II. Sanford Order**

That is not the end of the matter.  The Debtors complained of other problems besides the forgery.  One of these problems involves Goldberg's failure to disclose to them a prior sanctions order entered by this court against Goldberg.  The prior case involved a debtor named Raymond Sanford.  The ostensible goal of that representation was to secure Mr. Sanford a bankruptcy discharge.  The facts of the Sanford case are too convoluted to detail here, but broadly, Goldberg improperly filed two cases simultaneously for Mr. Sanford in an attempt to game the exemption system, and otherwise made a hash of the matter.  Indeed, things got so bad that by the time the sanctions order was entered, Mr. Sanford still did not have his discharge, almost five years after Goldberg first filed a case for him.  In an opinion dated March 17, 2009, the court found that Goldberg violated numerous rules of professional responsibility and local rules of practice.  *In re Sanford*, 403 B.R. 831 (Bankr. D. Nev. 2009) (the "***Sanford Order***").

The Sanford Order reprimanded and sanctioned Goldberg, and required Goldberg to "deliver a copy of this opinion to each client that he files a bankruptcy petition for, once his aggregate

1  billings for that client, for one case or related matters, exceed $5,000." *Id.* at 848. In a footnote, the

2  court explained that it set a threshold of $5,000 because this sanction was intended to apply "only in

3  cases in which [Goldberg] performs services beyond those normally required in standard cases." *Id.*

4  at 848 n.20.

5      Here, the form entitled "Disclosure of Compensation for Attorney for Debtors" that Goldberg

6  filed pursuant to 11 U.S.C. § 329(b) and FED. R. BANKR. P. 2016 stated that the Debtors agreed to

7  pay Goldberg $5,324. Of that sum, the Debtors actually paid a pre-petition retainer of $1,000. The

8  Debtors' case was filed after the entry of the Sanford Order, so if Goldberg's "aggregate billings"

9  exceeded $5,000, he would have been required to give the Debtors a copy of the opinion.

10     Goldberg testified that he did not give the Debtors a copy of the Sanford Order because his

11  fees for *legal services* in this case were only to be $4,920. Indeed, the retainer the Debtors signed

12  stated in a rather confusing manner that the cost of Goldberg's "legal fees" was $4,920.[11] The

13  difference between that number and the $5,324 stated in the disclosure form was accounted for by

14  filing fees ($274); a credit report ($30); and two credit counseling classes for the Debtors (a total of

15  $100). These fees and costs were to come out of the $1,000 retainer.

16     Goldberg testified he "paid out [these costs] . . . and d[oes not] receive any money" or profit

17  from them. Goldberg's understanding of the Sanford Order was that it was only triggered when the

18  fees that he personally kept exceeded $5,000. In this instance, Goldberg believed that although the

19  total bill to the debtors would exceed $5,000, he would only keep $4,920, and thus the Sanford

20  Order did not apply.

21     Given the court's stated intention that the Sanford Order should only apply in cases where

22  Goldberg preformed services "beyond those normally required in standard cases," and the

23  admittedly vague construction of what constitutes "aggregate billing" in excess of $5,000, the court

24  does not find that Goldberg intentionally violated the Sanford Order. Goldberg is entitled to a

25

26     [11]*See* note 19, *infra*, for the text of the retainer agreement.

10

1  reasonable interpretation of the court's order, and it is not an unreasonable interpretation of

2  "aggregate billing" to think that it would only apply to fees that Goldberg kept, not to expenses and

3  fees advanced from clients.

4      In the process of explaining how he did not violate the Sanford Order, however, Goldberg

5  revealed more troubling information.  In particular, he revealed that his standard office practice is to

6  commingle[12] client funds with funds he has earned from other clients.  This appears to be a clear

7  violation of Rule 1.15 of Nevada's Rules of Professional Conduct.[13]

8      Goldberg testified that he took the $1,000 retainer the Debtor paid him and deposited it, as is

9  his usual practice, into his general operating account.  Goldberg further testified that in the ordinary

10  course of his business he charges the costs and fees (including filing fees) he incurs on behalf of

11  clients on a credit card in his name,[14] and pays the resulting bill from this same general operating

12  account.  As mentioned above, in the Debtors' case, these costs were the filing fee ($274), a credit

13  report ($30) and two credit counseling classes (a total of $100), and these costs were to come out of

14  the Debtors' retainer.  Goldberg testified that he had no internal accounting or separate trust account

15  to segregate these advanced fees and costs from the money that he keeps as his fee.

16      Nevada Rules of Professional Conduct 1.15 states:

17          (a) A lawyer shall hold funds or other property of clients or third persons that
        is in a lawyer's possession in connection with a representation separate from the
18        lawyer's own property. All funds received or held for the benefit of clients by a
        lawyer or firm, including advances for costs and expenses, shall be deposited in one
19        or more identifiable bank accounts designated as a trust account. . . .
            (c) A lawyer shall deposit into a client trust account legal fees and expenses
20        that have been paid in advance, to be withdrawn by the lawyer only as fees are earned
        or expenses incurred.

21

22  _____

23      [12]Commingling is "to mix personal funds with those of a beneficiary or client." BLACK'S LAW
    DICTIONARY (9th ed. 2009).

24

25      [13]The court permitted Goldberg to submit additional briefing on this issue after the close of
    evidence, since it first emerged as an issue during the taking of testimony.

26      [14]When Goldberg files a case, the court charges the filing fee for his client to his credit card.

This rule "recognizes that in the course of the representing clients, lawyers will often have occasion to hold money or property of others . . . [and] states [a] fiduciary's traditional duty and adopts them as standard of professional conduct." 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 19.2, at p. 19-4 (3d ed. 2004). Commingling occurs the moment the attorney mixes the client's money with his or her own, even if the attorney quickly disaggregates the money. *Id.* at p. 19-5.

By taking the "advances for costs and expenses," as part of the Debtors' retainer, failing to "deposit[]" them into an "identified bank account[] designated as a trust account" and further failing to "withdraw[]" them "only as fees are earned or expenses incurred" Goldberg has violated Rule 1.15.

Goldberg submitted a post-hearing brief with two arguments as to why his failure to segregate the fees did not violate this rule. Initially, he argues that the Debtors did not actually advance him money to cover the costs and expenses he incurred. This, he argues, is because the costs these funds were meant to cover were incurred "contemporaneously" because Goldberg paid out the money more or less around the same time the Debtors gave it to him. Therefore the funds were in the nature of "advance reimbursements" – if such a term is not an oxymoron like "deferred maintenance" – and not "advances for costs and expenses." As a result, he was not holding the Debtors' money, and so had no duty to segregate.

This argument is flatly wrong. There is no concept of "close enough" in commingling. Money received from clients for expenses falls into one of two classifications. It is either an advance, in which case it must be segregated, or it is a reimbursement, in which case it does not need to be segregated. If the money must be segregated, an attorney has violated the rule against commingling if she mixes the advance with her money for even an instant. It does not matter if the advance is quickly removed from the commingled account. *See* 1 THE LAW OF LAWYERING, *supra*, § 19.4, at p. 19-9 ("Even where money is quickly restored to a separate account that has been invaded, and even where the client . . . suffers no loss, harsh sanctions usually follow as a

prophylactic warning that commingling cannot be tolerated.").

Moreover, the expenses were *not* incurred contemporaneously with Goldberg receiving the advances for them.  The Debtors paid the $1,000 retainer when they engaged Goldberg on May 6, 2009.  He did not file their case until nine days after that.  At a minimum, he commingled the $274 filing fee for those nine days.[15]  Goldberg had the opportunity to present evidence about when he cashed the $1,000 check the Debtors gave him.  Had Goldberg presented evidence that he did not cash the check until after he filed the Debtors' case, the Debtors' money would not be an advance for future costs, but a reimbursement for costs incurred.  However, as Goldberg failed to present any evidence on this point, the court assumes that the check was presented for collection before the case was filed, and therefore Goldberg commingled the Debtors' money.  Moreover, as the court has found above that the Debtors did not take the credit counseling class on May 6, 2009, Goldberg incurred those costs after the Debtors gave him the money to cover them, and commingled that money also.[16]

Next, Goldberg argues that this court should adopt the "minority" view, represented by a New York State Ethics Opinion, that prepaid fees and expenses are not actually client funds at all.  *See* New York State Ethics Op. 570 (1985).[17]  This is also wrong.  Nevada has adopted the "majority rule, now codified in Model Rule 1.15(c) . . . that advance payments for fees and expenses . . . are not to be commingled with the lawyer's funds, but are to be held in trust, and withdrawn only as fees

_____

[15]While the retainer may be non-refundable (which is acceptable in Nevada; *see* Nevada Ethics Opinion 15), if the Debtors decided not to file for bankruptcy, Goldberg cannot argue that he would not be required to refund the money advanced for filing fees for a case which was not filed and for which no fees were incurred.

[16]Or more accurately, since the Debtors never incurred the expense of taking a credit counseling class, Goldberg had no right to take the money the Debtors advanced to cover the class, or the money was retained as extra fees.  If that is the case, then Goldberg did violate the Sanford Order, since his total fees would then have exceeded $5,000.

[17]Available at http://www.nysba.org/AM/Template.cfm?Section=Ethics_Opinions &CONTENTID=18460&TEMPLATE=/CM/ContentDisplay.cfm (last visited February 10, 2010).

are earned or expenses are incurred."[18]  1 THE LAW OF LAWYERING, *supra*, § 19.4, at p. 19-9.  *See*

*also* Lester Brickman, *The Advance Fee Payment Dilemma*, 10 CARDOZO L. REV. 647, 651 (1988)

(stating that the minority view is "wrong as a matter of ethics, fiduciary law, and policy.  Indeed no

conclusion in N.Y. 570 [the ethics opinion Goldberg cites] or any of the minority opinions is found

acceptable or defensible.").

        Thus, Goldberg has commingled client funds and violated the Nevada Rules of Professional

Conduct.

### III.  Other Misconduct in Debtors' Representation

        The Debtors allege that Goldberg engaged in other misconduct in his representation of them.

They claim they wanted to file a chapter 7, but instead Goldberg filed a chapter 13; they thought that

Goldberg would help them modify their home mortgage, and that the total cost of these services

would be between $800 and $1,300; and they never agreed to pay Goldberg $5,324 for bankruptcy

only, with a loan modification as an additional cost; and, finally, their aim in filing for bankruptcy

was to save their house and Goldberg scheduled that house to be "surrendered" on their petition and

schedules.

        Rule 1.2 of Nevada's Rules of Professional Conduct states that "a lawyer shall abide by a

client's decision concerning the objectives of representation and, as required by Rule 1.4, shall

consult with the client as to the means by which they are to be pursued."  Rule 1.4 states that a

lawyer "shall . . . [r]easonably consult with the client about the means by which the client's

objectives are to be accomplished; . . . [k]eep the client reasonably informed about the status of the

matter; [and] . . . [p]romptly comply with reasonable requests for information."  Rule 1.4 also

requires that a lawyer "explain a matter to the extent reasonably necessary to permit the client to

make informed decisions regarding the representation."

---

        [18]Adopted unchanged by Nevada Rule 1.15(c).  When New York State Ethics Op. 570 was
issued in 1985, New York had not adopted a code of professional conduct based on the Model Rules,
as Nevada had.

In response to the Debtors' allegations, Goldberg submitted various documents that the Debtors signed on May 6, 2009. These documents mostly state that the Debtors were going to file chapter 13, and are signed by the debtor, co-debtor, or both Debtors. One of these documents states, in exquisitely opaque verbiage, that Goldberg's fee would be $4,920 plus costs.[19] Another of these documents states that Goldberg would charge another $1,250 for a loan modification.

Based on these documents, the court cannot conclude that Goldberg violated the Debtors' wishes. Given the documents produced at the hearing, it was not unreasonable for Goldberg to think that he was supposed to file chapter 13 for the Debtors, that he would not work on a loan modification, and that he would receive $4,920 plus fees for his services. After all, he did have signed documents stating these points.[20] The court also cannot conclude that it was unreasonable for Goldberg to schedule the Debtors' house as "surrender," since they had not made payments in seven months.[21]

---

[19]It actually declares that the Debtors acknowledged: "THAT I have been fully advised and informed that the standard cost of legal fees for the LAW OFFICES OF RANDOLPH H. GOLDBERG to process and oversee my Chapter 13 bankruptcy, will be $4920.00. This is the normal bankruptcy fee determined and set by the Chapter 14 [*sic*] Court and does not include court costs, credit counseling and credit reports. The retainer that I have paid today will be subtracted from the $4920.00 bankruptcy fee (which includes all filing fees)." (All emphasis, errors and incorrect statements of bankruptcy court procedure in the original.)

[20]Goldberg also testified that based on their projected disposable income, the Debtors were ineligible to file chapter 7.

[21]The Debtors actually wanted to modify the loans on their house, and continue to live there. At the time the case was filed, the Debtors' mortgage payment was around $2,200 a month. On Form 22 that Goldberg filed along with the Debtors' chapter 13 plan, he wrote "$0.00" as the Debtors' current monthly payment on their home, and only took the IRS local standard deduction of $1,189. Oddly, in the exhibits that Goldberg submitted to the court before the hearing, he included a Form 22 that had different numbers than the one he filed on the docket. There were other discrepancies between the figures on the two forms, but these were not explored at the hearing.

This is especially troubling in light of the recent Bankruptcy Appellate Panel and Ninth Circuit decisions that chapter 13 debtors may only deduct expenses from their means test calculations if they actually incur those expenses. *Ransom v. MBNA Am. Bank, N.A. (In re Ransom)*, 380 B.R. 799, 808 (B.A.P. 9th Cir. 2007), *aff'd, Ransom v. MBNA Am. Bank, N.A. (In re Ransom)*, 577 F.3d 1026, 1030 (9th Cir. 2009) (the "statutory language, plainly read . . . does not allow a debtor to deduct an

On the other hand, it also painfully clear that there was a severe breakdown of communications between the Debtors and Goldberg about their goals and means by which Goldberg would achieve the Debtors' goals.  Moreover, this breakdown in communication meant that the fundamental reason the Debtors filed for bankruptcy - to save their house - was ignored.  Based on the evidence, Goldberg seemed more interested in churning volume and moving on to the next fee than actually understanding what the Debtors were hoping to accomplish.

While Goldberg's failure to communicate with the Debtors is troubling, and part of a disturbing pattern, the court does not have enough evidence to conclude that Goldberg violated Rules 1.2 and 1.4 of the Nevada Rules of Professional Conduct.

### IV. Authority to Sanction

As discussed in this Opinion and Order, the court has found that Goldberg has violated FED. R. BANKR. P. 9011 and Nevada Rules of Professional Conduct 1.15, 3.3 and 8.4.  Bankruptcy courts have broad powers to discipline attorneys, and may even suspend them from practice or disbar them. These powers are derived from three sources. Initially, Bankruptcy courts are "vested with inherent powers to manage their cases and courtrooms and to maintain the integrity of the judicial system."

---

'ownership cost' (as distinct from an 'operating cost') that the debtor does not have.  An 'ownership cost' is not an 'expense'—either actual or applicable—if it does not exist, period").  In *Ransom*, the debtor could not take a deduction for his car, since he owned the car free and clear.  The same should hold true for housing - if a debtor's housing does "not exist," they cannot deduct any housing expenses.  Here, if Goldberg thought the Debtors' housing expenses were "$0.00," it was improper for him to take any deductions for housing at all.

Of course, the Debtors would have been required to live *somewhere,* and it was Goldberg's obligation to craft the Debtors' plan in light of *Ransom*.  The Debtors stated that they wished to remain in their house.  Had they started making payments again, and had Goldberg included the Debtors' actual payment in his calculation, he would have saved the Debtors almost $1,000 a month in chapter 13 plan payments.  That reduction in income may have rendered the Debtors eligible to file chapter 7.  This apparent malpractice is not at issue in this hearing.

On the other hand, Goldberg testified that the Debtors told him that their intention was to surrender their house.  While the court cannot credit this testimony as Goldberg also testified that he cannot remember any dealings with the Debtors, "surrender" can mean very different things to an experienced bankruptcy attorney and to debtors intent on keeping their residence.  It was Goldberg's obligation to ensure that his clients understood these distinctions.

*In re Brooks-Hamilton*, 400 B.R. 238, 247 (9th Cir. B.A.P. 2008).  This inherent authority extends even to allow a court to suspend or disbar attorneys.  *Id; Peugeot v. United States Trustee (In re Crayton),* 192 B.R. 970, 976 (9th Cir. B.A.P. 2005) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) and *In re Johnson*, 921 F.2d 585 (5th Cir. 1991)).

Bankruptcy courts also have authority under 11 U.S.C § 105 to impose penalties, including suspension of an attorney.  *In re Brooks-Hamilton*, 400 B.R. at 247; *In re Crayton,* 192 B.R. 976; 2 Collier *supra* ¶ 105.04.

Finally, Fed. R. Bankr. P. 9011 permits a bankruptcy court to "impose an appropriate sanction . . . limited to what is sufficient to deter repetition" of improper conduct, including suspension from practice.  *In re Brooks-Hamilton*, 400 B.R. at 247.

The Bankruptcy Appellate Panel for the Ninth Circuit has held that when a bankruptcy court disciplines an attorney, it must be guided by three criteria: 1) the disciplinary process must be fair; 2) the evidence must support the finding; and 3) the penalty imposed must be reasonable.  *In re Brooks-Hamilton*, 400 B.R. at 247 *(*citing *Price v. Lehtinen (In re Lehtinen)*, 332 B.R. 404 (9th Cir. B.A.P. 2005) and *Peugeot v. United States Trustee (In re Crayton),*192 B.R. 970, 978 (9th Cir. B.A.P. 1996)).

In practice, the fairness criteria means that the attorney must receive notice and be given an opportunity to be heard before he or she is sanctioned.  *In re Brooks-Hamilton*, 400 B.R. at 251.  Here, Goldberg was given notice of the hearing, and the Order to Show Cause laid out the court's concerns about his conduct.  Goldberg attended the hearing, was represented by counsel and presented evidence and testimony in his defense.  And after the court expressed concerns that Goldberg commingled client funds, he was given an opportunity to demonstrate why he did not.  Therefore, under *Brooks-Hamilton* the disciplinary process was fair to Goldberg.

Next, the evidence must support the finding.  As it relates to Rule 9011, this means that "the bankruptcy court must find that [the attorney] filed papers that are frivolous . . . A frivolous paper is one that is both baseless and made without a reasonable and competent inquiry.  That is, it is [not]

1    well-grounded in fact . . .".  *In re Brooks-Hamilton*, 400 B.R. at 251-52 (citations omitted).  Here,

2    the court has found that Goldberg, or someone in his office, improperly used the Debtors' personal

3    information, impersonated them online, and as a result, forged credit counseling certificates, which

4    were then filed by Goldberg under the penalty of perjury.  Forged documents cannot be "well-

5    grounded in fact" and it was therefore impossible for Goldberg to have a reasonable or good-faith

6    belief that the credit counseling certificates were not frivolous, and as such, the court had ample

7    evidence to support its finding that Goldberg violated Rule 9011.[22]

8            Finally, the sanctions must be reasonable.  The BAP has "adopted ABA standards as the

9    means for determining reasonable sanctions," and "failure to consider such factors constitutes an

10   abuse of discretion" upon an appeal to the BAP.  *In re Brooks-Hamilton*, 400 B.R. at 251.[23]   These

11   ABA standards dictate that:

12           To determine an appropriate sanction, the bankruptcy court should consider: (1)
             whether the duty violated was to a client, the public, the legal system or the
13           profession; (2) whether the lawyer acted intentionally, knowingly or negligently; (3)
             whether the lawyer's misconduct caused a serious or potentially serious injury; and
14           (4) whether aggravating factors or mitigating circumstances exist.  Aggravating
             factors include considerations that justify an increase in the degree of discipline
15           imposed, such as a prior disciplinary offense, multiple offenses, a pattern of
             misconduct, and refusal to acknowledge the wrongful nature of the conduct.
16           Mitigating circumstances include considerations which justify a reduction in the
             degree of discipline, such as the absence of a prior disciplinary record, personal or
17           emotional problems, inexperience in the practice of law, or a timely good faith effort

18   _____

19           [22]While the BAP has not provided explicit guidance on how to find violation of state ethical
20   rules, the court also has ample evidence that Goldberg has violated Nevada Rules of Professional
     Conduct 1.15, 3.3 and 8.4.

21           [23]While the BAP has acknowledged that there are "serious questions to the appropriateness"
22   about requiring mechanical recitation and application of the ABA standards that are both discordant
     with the standard of review and that may not fit the facts or context of an appeal, the BAP is "bound
23   by its prior decisions" to apply the standards.  *In re Brooks-Hamilton*, 400 B.R. at 238, n.18.  This
     oddity in compounded by the fact that BAP decisions are not binding authority on bankruptcy courts,
24   but yet supply the binding standard of review when the BAP reviews bankruptcy court decisions.  On
     the other hand, if the appeal goes to a district court, the ABA standards are not necessarily binding.
25   So while it would not be an abuse of discretion for a bankruptcy court to ignore the ABA standards
     if the appeal goes to district court, it would be an abuse of discretion if the same appeal goes to the
26   BAP.  *See In re Brooks-Hamilton*, 400 B.R. at 238 at 253 (Markell, J., concurring).

to make restitution or to rectify the consequences of the misconduct.

*Id.* (citations omitted).  Goldberg has violated his duties to the Debtors by commingling their money, and to the legal system by forging documents and filing them.  Goldberg acted knowingly, as the court has found that he intentionally filed falsified credit counseling certificates and commingled client funds.  Had Goldberg's forging of credit counseling certificates gone undetected by the Debtors, the court would have potentially granted a discharge based on fraudulent documents. Goldberg's violations are aggravated by his previous disciplinary offences, *In re Sanford*, his pattern of misconduct, *In re Sanford*, and his refusal to acknowledge the wrongful nature of his conduct. Goldberg is not inexperienced; he testified that he has handled up to 25,000 cases in the past 13 years.  Goldberg presented no evidence that he suffered from a physical or emotional problem.  Nor is there any evidence that Goldberg has undertaken timely or good-faith efforts to make restitution to the Debtors nor has he withdrawn the forged documents from the docket.

**V. Sanctions.**

As discussed in the Opinion and Order, the court has found that Goldberg has violated FED. R. BANKR. P. 9011 and Nevada Rules of Professional Conduct 1.15, 3.3 and 8.4.  The Order to Show Cause listed these concerns,[24] and invited Goldberg to suggest appropriate sanctions given the ABA Standards regarding such sanctions.  The court has reviewed Goldberg's responses and the ABA Standards.

The court therefore orders the following sanctions in an effort to deter future similar violations by Goldberg and others:

a.  As sanctions for Goldberg's forgery of the credit counseling class, the court will make a criminal referral to the United States Attorney for the District of Nevada.  The court also assesses two separate civil sanctions against Goldberg.  First, Goldberg shall return to the

---

[24]The Order to Show Cause listed the potential violations the court knew about beforehand. After the court learnt about Goldberg's commingling at the hearing, it gave him the opportunity to address those concerns.

Debtors the $1,000 that they paid him.  Goldberg shall also pay to the court a further sanction of $4,920, the expected fee from the Debtors.[25]  Goldberg shall file proof that these amounts have been paid within 10 days of the entry of this order.

b.  For commingling client funds, within 60 days of the entry of this order Goldberg shall bring his practices into compliance with Rule 1.15, and shall report to the court by a filing in this case the steps he took to remedy his violation.  Independently and before filing this report, the court will also report Goldberg's conduct to the State Bar of Nevada.[26]

c.  To the extent not stayed for purposes of appeal, the court will publish this opinion after removing references to the record.

d.  For the five years following the publication of this opinion, Goldberg shall be required to give a copy of it to every client who is entitled to receive a copy of the *Sanford Order*.  During that same period, he shall also provide it to any administrative body, court or litigant who seeks, by motion, order, or otherwise, to sanction Goldberg for his conduct as a lawyer.   This includes, but is not limited to, any motion filed under Rule 9011, any investigation opened by the State Bar of Nevada, and any order to show cause or other similar order issued by a bankruptcy judge.  Goldberg shall also file a copy of this opinion in *In re Goodman*, case no. 08-19036-mkn.

e.  Finally, the court makes a clarification and a modification to the *Sanford Order*.  First, the requirement that Goldberg furnish his clients with a copy of the *Sanford Order* shall only be triggered if his professional fees for services rendered are in excess of $5,000, excluding

---

[25]Goldberg's refund of the $1,000 paid does not absolve him of further sanctions.  The court's duty to ensure that the Rules are followed and Goldberg's obligation to refund money he didn't earn are separate matters.

[26]*See* Rule 8.3, Nevada Rules of Professional Conduct ("Reporting Professional Misconduct-- (a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.")

1    costs.  Next, the pendency of the *Sanford Order* shall be extended for another two years.

2    **VI. Conclusion**

3        Once again, the court is confronted with Goldberg's depressing indolence in matters related to

4    the Rules of Professional Conduct and Federal Rules of Bankruptcy Procedure.  The current

5    economic downturn has been crushingly severe in southern Nevada, resulting in an explosion of this

6    court's docket.  There are innumerable other matters to which the court would prefer to devote its

7    limited time and attention, and numerous other debtors whose needs require attention.  But the legal

8    profession is self-regulating.  It is thus this court's reluctant duty to deal with Goldberg's many

9    violations of the Rules, his disregard for the trust his clients place in him, and his cozening of people

10   in their moments of weakness.  These violations are external evidence that Goldberg has designed the

11   business side of his law practice with a grudging lassitude to his ethical obligations.  Put another way,

12   he operates as if the occasional sanction is simply a cost of doing business.

13       Sanctions are more than just mercantile matters.  Sanctions seek to dissuade an attorney (and

14   others similarly situated) from engaging prohibited and unethical conduct.  This court has had the

15   benefit of observing Goldberg's practices over time, and the results of these observations are grim.

16   The sanctions the court entered in *In re Sanford* seem to have had little or no effect on Goldberg's

17   general operations.  It thus appears that further sanctions are necessary to dissuade Goldberg (and

18   others who might wrongheadedly attempt to emulate him) from continued and repeated violations of

19   rules designed to protect his clients specifically and the legal profession generally.

20       The court sincerely wishes that it never has to deal with such matters again.  If it does, it has

21   within its powers the power to deny Goldberg access to this court by banning him from appearing in

22   this court.  *In re Brooks-Hamilton*.  That is a sanction, however, that is as severe as it would be

23   crippling to Goldberg's livelihood.  But if equally severe violations of clients' rights and the

24   profession's expectations continue to occur, there will be little else left to do.

25       The Opinion and Order represents this court's findings of fact and conclusions of law under

26   FED. R. BANKR. P. 7052.

Copies sent to:

BNC MAILING MATRIX


RANDOLPH GOLDBERG
randolphgoldberg@yahoo.com, randolphgoldberg@yahoo.com

KATHLEEN A. LEAVITT
courtsecf3@las13.com


CHRISTOPHER PATRICK BURKE on behalf of Randolph Goldberg
atty@cburke.lvcoxmail.com


AUGUST LANDIS
Augie.Landis@usdoj.gov


Edward McDonald
edward.m.mcdonald@usdoj.gov


State Bar of Nevada
600 E. Charleston Blvd
Las Vegas, NV  89104


                                    # # #